IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| JUDITH A. KURIEN,<br><br>    Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security Administration<br><br>    Defendant. | CV 16–59–M–JCL<br><br>ORDER |

  Plaintiff Judith Kurien brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-433. Kurien protectively filed her application in July 2011, and alleges disability since June 1, 2011 due to "back – compressed discs, chronic fatigue syndrome, depression, migraines, headeaches, and chronic pain." (AR 392). Kurien's application was denied initially and on reconsideration, and she requested an administrative hearing. Kurien appeared with a non-attorney representative at her administrative hearing in April 2013, and an ALJ issued an

unfavorable decision approximately two months later. (AR 138-89, 213-26). The Appeals Council granted Kurien's subsequent request for review, and remanded the case for further administrative proceedings. (AR 231-36). Kurien appeared with the same non-attorney representative at her second administrative hearing on March 11, 2014. (AR 34-137). On April 4, 2014, the ALJ issued a decision finding Kurien not disabled within the meaning of the Act. (AR 8-28). The Appeals Council denied Kurien's request for review, making the ALJ's decision the agency's final decision for purposes of judicial review. (AR 1-4). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Kurien was 43years old at the time of her amended onset date, and 46 years old at the time of the ALJ's second decision.

I. **Standard of Review**

This Court's review is limited. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II. <u>Burden of Proof</u>

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at 1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If not, the ALJ must determine at step two whether the claimant has any impairments that qualify as "severe" under the regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will compare those impairments to the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(iii). If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## III. Discussion

The ALJ found at step one that Kurien meets the insured status requirements of the Act through December 31, 2017, and had not engaged in substantial gainful

activity since her amended onset date. (AR13). At step two, the ALJ found that Kurien had the following severe impairments: chronic fatigue syndrome, degenerative disk disease of the lumbar spine, obesity, sleep apnea, cognitive disorder not otherwise specified, attention deficit hyperactivity disorder, depressive disorder not otherwise specified, and generalized anxiety disorder. (AR 13). The ALJ concluded at step three that Kurien did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments. (AR 14). The ALJ also found that while Kurien's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms" were not entirely credible. (AR 18 ). The ALJ found that Kurien could perform a reduced range of light work, including work as a folder, stuffer, or shoe packer.

### A. Credibility

Kurien contends the ALJ did not provide sufficiently clear and convincing reasons for discrediting her testimony. If the ALJ finds "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about

the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations omitted).  Kurien met her initial burden because she provided evidence that she has underlying impairments that could reasonably be expected to produce pain and other symptoms, and the ALJ did not find that she was malingering.  As set forth below, however, the ALJ then provided clear and convincing reasons for finding Kurien's subjective testimony only partially believable.

Kurien testified that she has typically has headaches four times a week.  She explained that she lies down until the headaches get better, but that the pain never goes away entirely.  (AR 44).  Kurien testified that she attends bible study twice a week unless she has a headache, and that she usually misses about three bible study classes each month.  (AR 45-46).  Kurien said she also attends church on Sundays unless her headaches interfere, and that she usually manages to get there twice a month.  (AR 46).  Kurien testified that she occasionally plays cards with friends (AR 46-47), but that when her medication is not working her depression is so severe that she usually does not go anywhere or do anything.  (AR 56).  Kurien explained that when her medication is not working, she spends her days on the couch and does not even get dressed or shower or brush her teeth.  (AR 56).  She

testified that she started taking Latuda in September 2013, and said the medication was working and she was no longer as depressed. (AR 57). Kurien explained that she suffered from increasingly intense back pain, and had not vacuumed in more than a year because doing so caused severe back pain. (AR 66-67). Kurien said she could not work due to chronic fatigue, which made her feel as if she was in a fog. (AR 67).

The ALJ found Kurien's subjective testimony less than entirely believable for a number of reasons. To begin with, the ALJ found that her allegations of disabling physical limitations were not fully supported by the medical evidence. (AR 18 ). For example, the ALJ noted that records from a January 2012 follow up visit for chronic fatigue indicated Kurien was "overall feeling a lot better" and had improved with "counseling, medications, and exercise." (AR 18, 602-03). At another follow up visit in February 2012, Kurien reported that counseling and stretching were both helping (AR 611), and in December 2012 her chronic fatigue syndrome was "improved" on Ritalin. (AR 679). The ALJ reasonably found that Kurien's complaints of debilitating fatigue were not entirely supported by medical records reflecting that her symptoms improved with exercise and medication.

The ALJ also addressed Kurien's allegations of disabling headaches at step two. (AR 14). Kurien testified that she has to lie down to severe headaches four

times a week, and said that the pain never goes away entirely. (AR 44). The ALJ permissibly found the fact that Kurien took only over the counter medication for headaches undermined her testimony as to the severity of her headaches. (AR 14).

The ALJ recognized that Kurien also described considerable back pain, and that imaging studies from March 2013 showed a moderate wedge compression deformity at L1 and multilevel degenerative changes. (AR 18, 720). The ALJ accepted that Kurien's back impairment caused her some pain, and limited her to a range of light work. But the ALJ noted that physical examinations did not show any significant deficits related to her back. In June 2011, for example, a physical examination was negative for any bone/joint symptoms and muscle weakness. (AR 566). And in November 2011, a physical examination showed some muscle tenderness with no spasm. (AR 591). The ALJ reasonably found that the "longitudinal record" did not support Kurien's allegations of significant back pain, which was well-controlled on medication except for a flare-up in March 2013. (AR 19, 693).

The ALJ addressed Kurien's credibility as to the severity of her mental impairments separately. Kurien completed a function report on which she indicated that she was too tired and depressed to leave the house for anything other than appointments (AR 384), and did not go to church or participate in any

other social activities on a regular basis (AR 385). Kurien wrote that her only social activity involved talking on the phone or getting on facebook once a week. (AR 385). The ALJ permissibly found that Kurien's allegations of such extreme social limitations were not consistent with her testimony that she attended church and bible study on a regular basis and played cards with friends. (AR 19).

The ALJ further discounted Kurien's testimony as to the severity of her depression based on the fact that the medical records contained medical examination status findings that revealed limited mood symptoms. The records cited by the ALJ describe Kurien at medical visits between June 2011 and February 2012 in such terms as: "alert and oriented" with "no unusual anxiety of evidence of depression" (AR 558); "affect normal, alert, oriented x3" (AR 585, 591, 603, 612); "alert, oriented x3, appropriate mood and affect, affect normal, good eye contact, normal speech, not delusional, no thought disorder, no hallucinations, good judgment, good insight, denies suicidal ideation." (AR 605-06). At visits in July 2012, Kurien's mood was described as "neutral" and "stable" and her affect was described as increasingly brighter, engaged, and responsive. (AR 658, 659). Treatment notes from November and December 2012 describe her in such terms as bright, positive, engaged, animated, and stable. (AR 676, 682).

While these records describe relatively limited mood symptoms, others are

indicative of more severe symptoms. In November 2011, for example, Kurien "affect flat, good eye contact, depressed, psychomotor slowing, alert, oriented x3, no thought disorder, fair judgment, fair insight" (AR 595). On the whole, Kurien's medical records reflect that she had longstanding depression with symptoms that waxed and waned in their severity. The ALJ accepted that Kurien's depression was severe, but permissibly discounted her testimony as to its debilitating severity based on the fact that her the medical examination status findings in the record often revealed limited mood symptoms.

The Court finds that these were sufficiently clear and convincing reasons for finding Kurien's subjective testimony as to the severity of her physical and mental impairments only partially believable.

### B.　Medical Opinions

Kurien argues the ALJ erred by not giving more weight to opinions provided by her treating and examining physicians. A treating physician's opinion is entitled to greater weight than that of an examining physician on the basis that he has a "greater opportunity to observe and know the patient." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). An examining physician's opinion in turn "carries more weight than a reviewing physician's." *Holohan v. Massanari*,

246 F.3d 1195, 1202 (9th Cir. 2001). The weight given a treating or examining physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2).

The ALJ may disregard a treating physician's opinion whether or not that opinion is contradicted. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). The ALJ may accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751. Similar standards apply to the ALJ's evaluation of an examining physician's opinion. *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006).

    1.    <u>Dr. Jacqueline Day</u>

Dr. Jacqueline Day is a neuropsychologist who examined Kurien in December 2012 on referral from her vocational rehabilitation counselor, who wanted more information about her cognitive and psychological functioning. (AR 643-650). Dr. Day administered neuropsychological testing which "suggest[ed]

the presence of mild to moderate, somewhat generalized cerebral dysfunction that is occurring within the context of Average intellectual abilities and many cognitive strengths." (AR 648). Dr. Day explained that Kurien's psychological functioning was of greater concern than her cognitive impairment, noting that the results of personality testing using the MMPI-2 suggested she was "struggling with symptoms of a severe depression, as well as significant problems with anxiety and social isolation." (AR 649). Dr. Day concluded that although Kurien's overall level of cognitive impairment was not severe enough to prevent her from working, her depression and anxiety in combination with her chronic fatigue syndrome and mild to moderate cognitive impairment would "make it extremely difficult for her to maintain competitive employment."[1] (AR 649-50).

The ALJ considered Dr. Day's report and the results of her neuropsychological testing, but rejected her opinion that Kurien would be unable to work in part because it was not consistent with the results of the testing she administered, which reflected a full-scale intelligence quotient of 92. (AR 21).

---

[1] Because Dr. Day's opinion was contradicted by that of the state agency reviewing physician (AR 199-200) and the medical expert, psychologist Dr. Michael Enright, the ALJ could reject it by providing specific and legitimate reasons supported by substantial evidence. See *Bray v. Commissioner*, 554 F.3d 1219, 1228 n. 8 (9th Cir. 2009).

The ALJ found that Dr. Day's opinion was also inconsistent with the results of aptitude testing administered as part of a vocational evaluation, which revealed many vocational skills and strengths and was indicative of only moderate limitations. (AR 21, 700). The ALJ also gave Dr. Day's opinion little weight because it was not consistent with the medical records discussed above, which often described limited mood symptoms. These were sufficiently specific and legitimate reasons for giving little weight to Dr. Day's opinion as to the disabling severity of Kurien's impairments.

      2.    <u>Dr. Ned Vasquez and Dr. Benjamin Grass</u>

Dr. Ned Vasquez supervised the work of Dr. Benjamin Grass, who was one of Kurien's several treating health care providers at Partnership Health Center. On February 23, 2014, Dr. Grass completed a physical capacity assessment form on which he indicated that Kurien was physically incapable of sustaining an eight-hour workday. (AR 742-47). Dr. Grass also completed a mental capacity assessment form on which he indicated that Kurien had slight to moderate difficulties handling simple instructions, marked difficulties handling more detailed instructions and making complex work-related decisions, moderate difficulties interacting with others, and marked difficulties responding

appropriately to usual work situations and to changes in a routine work setting. (AR 738-41). Dr. Vasquez signed off on both forms as Dr. Grass's supervisor.

The ALJ characterized the assessments as having been completed by Dr. Vasquez, and gave them little weight because his treatment history with Kurien was brief and his opinions were apparently based on a single visit in February 2013. Kurien points out that the assessments were actually completed by treating physician Dr. Grass, and argues the ALJ erred by stating they were completed by Dr. Vasquez after examining her only once. While it is true that Dr. Grass completed the forms and Dr. Vasquez signed off on them, the ALJ's misstatement was harmless error. It appears that by the time Dr. Grass completed the two assessments on February 23, 2014, he had seen Kurien at most five for six times – most recently on February 20, 2014. (AR 731, 749, 125). And Dr. Vasquez was apparently present only at the February 2014 appointment. (AR 750). As the ALJ accurately noted, Kurien reported "no concerns today" at the February 2014 appointment and was there "regarding paperwork for social security." (AR 749). The ALJ permissibly gave the two assessments little weight in part based on the short duration of the treatment relationship between Kurien and the doctor who completed them.

With respect to the physical capacities assessment, the ALJ legitimately gave it little weight for the additional reason that it was not consistent with the brief physical examination performed at the February 2014 appointment and the lack of positive physical exam findings elsewhere in the record. (AR 23). Dr. Grass's notes, with which Dr. Vasquez agreed, reflect that Kurien had chronic fatigue syndrome but there were no significant findings following a physical examination that day. (AR 749-50). The rest of Kurien's medical records similarly contain little in the way of significant findings with respect to physical examinations. (AR 584-616; 653-89; 721-37).

Turning to the mental capacities assessment form, the ALJ agreed that Kurien was generally capable of handling simple instructions but would have difficulty with more complex instructions. (AR 23). The ALJ also agreed that Kurien would be moderately limited in the area of interacting appropriately with the public. (AR 23). But the ALJ did not accept that Kurien's ability to interact with supervisors and co-workers would be significantly limited because such a limitation was not consistent with her social activities, which included attending church and playing cards, or the limited mood symptoms noted in the record and discussed above. (AR 23). The ALJ rejected the idea that Kurien would have

marked difficulty responding appropriately to work situations and to changes in a routine work setting in part based on Dr. Day's testing, which revealed a full-scale intelligence quotient of 92, and other aptitude testing indicative of only moderate limitations in those areas. (AR 24, 700). These were sufficiently specific and legitimate reasons for discounting the physical and mental capacity assessment forms completed by Dr. Grass and approved by Dr. Vasquez.

        3.     Dr. Marsha McFarland

In December 2011, nonexamining state agency psychologist Dr. Marsha McFarland completed a mental residual functional capacity assessment identifying some mild and moderate limitations. Dr. McFarland found that Kurien would be capable of work not requiring intense concentration, and would do best at work not requiring extensive interaction with the general public. (AR 199-200).

Kurien argues on one hand that the ALJ gave too much weight to Dr. McFarland's opinion because it was issued in 2011 and she did not have an opportunity to review the entire record. On the other hand, Kurien argues the ALJ should have given more weight to other aspects of Dr. McFarland's opinion, such as her statement that Kurien's concentration might be variable and her attendance might be problematic.

The ALJ permissibly considered Dr. McFarland's opinion in conjunction with the many other medical opinions in the record, and gave it some weight. He also considered and gave some weight to more recent medical opinions, such as those provided by Dr. Day and medical expert Dr. Michael Enright. To the extent the ALJ rejected Dr. McFarland's opinion that Kurien's concentration might be variable, he found her opinion was not supported by cognitive and aptitude testing and the limited mental status exam findings. And to the extent Dr. McFarland found that Kurien's attendance might be problematic, he gave her opinion little weight because the medical records of Kurien's physical examinations did not show significant problems.

The Court is satisfied based on its review of the record that the ALJ appropriately weighed the various medical opinions in assessing Kurien's residual functional capacity.

### C. Other Source Evidence

#### 1. John Honsky

Kurien argues the ALJ erred by not giving more weight to the opinion of nurse practitioner John Honsky. Honsky saw Kurien roughly a dozen times between November 2011 and October 2013. In November 2012, Honsky

completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on which he indicated that Kurien's mental impairments caused slight limitations in understanding and carrying out simple instructions, but caused marked limitations in understanding and following complex instructions, making judgments on simple work-related decisions, and responding appropriately to work pressures. (AR 651-52). Honksy also indicated that Kurien had extreme limitations in responding appropriately to changes in a routine work setting, and wrote that she had shown increased cognitive impairment over the past year. (AR 651-52).

Nurse practitioners are defined as "other sources," not acceptable medical sources. Other sources can provide evidence about the severity of a claimant's impairments and how they affect the claimant's ability to work. *See* 20 C.F.R. § 404.1513. While an ALJ must provide specific and legitimate reasons based on substantial evidence to discount evidence from an "acceptable medical source," evidence from an "other source" like Honsky is not entitled to the same deference and may be discounted if the ALJ provides germane reasons for doing so. *Molina v. Astrue*, 674 F.3d 1104, 1111-12 (9th Cir. 2012).

The ALJ adopted portions of Honsky's opinion. For example, he agreed

that Kurien could understand and follow simple instructions but would have difficulty understanding and following complex instructions. The ALJ also credited Honsky's opinion that Kurien would have marked difficulty making work-related decisions and moderate difficulty interacting appropriately with the public. But the ALJ did not agree with Honsky's opinion that Kurien would have marked difficulty interacting with supervisors and co-workers and responding appropriately to work pressures in a usual work setting. As he did with the mental capacity form discussed above, the ALJ found that such marked limitations were not supported by Dr. Day's testing and other aptitude testing indicative of only moderate limitations. The ALJ also rejected Honsky's opinion that Kurien would have extreme difficulty responding to changes in a routine work setting. He found the fact that Kurien was able to go to church and bible study, and play cards with friends indicated she was generally capable of handling changes in her routine. These were sufficiently germane reasons for giving aspects of Honsky's opinion little weight.

### D. Vocational Expert

Kurien argues the ALJ's hypothetical to the vocational expert did not comply with the Appeals Council's remand order because it did not capture all of

her alleged limitations. But because the ALJ properly evaluated the medical evidence and Kurien's credibility, the hypothetical question was supported by substantial evidence. *See Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (the ALJ need not include limitations not supported by substantial evidence).

## IV. Conclusion

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of legal error. Accordingly,

IT IS ORDERED that the Commissioner's decision is affirmed.

DATED this 4th day of January, 2017

Jeremiah C. Lynch
United States Magistrate Judge